IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON


SANDRA TURNER,                              :

                          Plaintiff,                            Case No. 3:09-cv-258

                                                               District Judge Walter Herbert Rice
                                                               Magistrate Judge Michael R. Merz

          -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                          Defendant.          :


## REPORT AND RECOMMENDATIONS


          Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3)

as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of

Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits.

The case is now before the Court for decision after briefing by the parties directed to the record as

a whole.

          Judicial review of the Commissioner's decision is limited in scope by the statute

which permits judicial review, 42 U.S.C. §405(g).  The Court's sole function is to determine whether

the record as a whole contains substantial evidence to support the Commissioner's decision.  The

Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a.

With respect to the present case, eligibility is dependent upon disability, income, and other financial

resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is

suffering from a medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than

twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes

performance of the claimant's former job or any other substantial gainful work which exists in the

national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or

alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the

claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability

determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged

in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment

or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe

impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1

(1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is

found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's

impairments do not meet or equal a listed impairment, the Commissioner determines if the

impairments prevent the claimant from returning to his regular previous employment; if not, the

claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous

employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI in March, 2005, alleging disability from January 21, 2005, due to a brain injury as the result of a fall and ear infection. (Tr. 61-65; 343-44; 75-81). Plaintiff's applications were denied initially and on reconsideration. (Tr. 40-43; 45-46; 346-48; 350-52). Subsequently, Administrative Law Judge Melvin Padilla held a hearing, (Tr. 357-88), and found that Plaintiff is not disabled. (Tr. 15-31). The Appeals Council denied Plaintiff's request for review, (Tr. 6-8), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that she has severe impairments consisting of: "occasional" cocaine and some marijuana abuse not in remission, possible mild cognitive deficit, and mild anxiety disorder, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 21, ¶ 3; Tr. 24, 20 4). Judge Padilla then found that Plaintiff has the residual functional capacity for a reduced range of medium work. *Id.,* ¶ 5. Judge Padilla used sections 203.21 through 203.25 (before attaining age fifty-five) and sections 203.14 through 203.17 (after attaining age fifty-five) of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 29, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 31).

Plaintiff was hospitalized February 3 through February 11, 2005, after "acting strangely", having headaches, and falling down for three days. (Tr. 144-77). A brain CT indicated that Plaintiff had markedly dilated ventricles and a question of imminent brain herniation, an MRI

of Plaintiff's brain revealed frank pus in the ventricles, and a culture of Plaintiff's spinal fluid was markedly abnormal. *Id.* Plaintiff was treated with medications for meningitis, responded well, and was discharged to the rehabilitation unit. *Id.*

Plaintiff remained in the rehabilitation unit from February 11 through February 25, 2005, with the diagnoses of acquired brain injury, pneumococcal meningitis, and need for inpatient rehabilitation. (Tr. 178-83). At the time she was admitted to the rehabilitation unit, Plaintiff's tox screen was positive for cocaine and opiates. *Id.* Plaintiff participated in a rehabilitation program under the care and direction of Dr. Pedotos and was discharged at a modified independent level of functioning. *Id.* Subsequently, Plaintiff participated in a Comprehensive Outpatient Rehabilitation Program ("CORP") through April 29, 2005. (Tr. 199-24).

Dr. Pedotos reported on March 10, 2005, that Plaintiff's diagnosis was acquired brain injury, that she had impaired self-care skills, mobility, cognition, independence, communication, endurance, balance, cognition, language, attention, comprehension, memory, and decreased safety awareness, and that she required additional occupational, physical, and speech therapy, a driving evaluation, neuropsych testing, and a vocational referral. (Tr. 164-69). Dr. Pedotos also reported that Plaintiff was able to stand/walk for four hours in an eight-hour day and for one hour without interruption and sit for six hours in an eight-hour day and for three hours without interruption, and that she was able to lift/carry eight to ten pounds. *Id.* Dr. Pedotos reported further that Plaintiff was moderately to markedly limited in her abilities to perform most work-related mental activities. *Id.* Dr. Pedotos opined that Plaintiff was unemployable and would be for twelve or more months. *Id.*

Examining physician Dr. Danopulos reported on April 28, 2005, that Plaintiff's

mental status was normal, she stuttered slightly, moved in the exam room freely, and that her examination was normal. (Tr. 190-98). Dr. Danopulos also reported that most of the problems Plaintiff had such as headaches, disbalance, stuttering, hypoglycemia, and forgetfulness were all sequelae of her brain problem, that on physical exam there was no specific problem with her cervical or lumbar spine except that she complained of pain on pressure and motion. *Id.* Dr. Danopulos opined that Plaintiff's complaints of neck and lumbar spine pain were arthralgias and did not interfere in a negative way with her ability to perform work-related activities, her mental disbalance was triggered by her severe meningitis or encephalitis event, had eased considerably, and possibly would continue to ease. *Id.*

Examining psychologist Dr. Bonds reported on May 2, 2005, that Plaintiff completed a bachelor's degree in social work, had an associate degree in applied sciences, was trained as a mental health technician, began using marijuana in her twenties, began using crack cocaine in her fifties, used twenty to fifty dollars worth of crack a month on an occasional basis, and that she stopped using crack several months ago. (Tr. 239-48). Dr. Bonds also reported that Plaintiff's speech was clear, her thought processes were normal, her mood seemed normal, her affect was broad and appropriate, and that she did not display any overt signs of anxiety. *Id.* Dr. Bonds noted that Plaintiff's mental content was normal, she was alert and oriented, she had sufficient insight and judgment, her verbal IQ was 88, her performance IQ was 84, and her full scale IQ was 85 placing her in the low average range of intellectual functioning, her verbal comprehension, expression, and reasoning skills were low average, and that her memory skills were in the low average range. *Id.* Dr. Bonds also noted that Plaintiff's reading comprehension was at the 12.0 grade level, and her rate and accuracy scores were at the 8.4 and 9.2 grade levels respectively. *Id.* Dr. Bonds identified

Plaintiff's diagnosis as cognitive disorder NOS and he assigned her a GAF of 60. *Id.* Dr. Bonds opined that Plaintiff's ability to interact with others was not significantly impaired, her ability to understand, remember, and follow instructions was mildly impaired, her ability to maintain attention, concentration, persistence, and pace was not impaired, and that her ability to tolerate the stress and pressures associated with day-to-day work activities was mildly impaired. *Id.*

Examining psychologist Dr. Ladle reported on June 17, 2005, that Plaintiff obtained a bachelor's degree in social work, had some vocational training in office management, denied any use of alcohol or drugs, she was alert and oriented, and that some stuttering was slightly evident during the evaluation. (Tr. 248-53). Dr. Ladle also reported that test results indicated that Plaintiff's immediate memory/attention and concentration were in the severely impaired and low average ranges respectively, her performance on visual measures of immediate memory/attention and concentration were in the average and mildly impaired ranges respectively, and that on a sustained concentration task where she had to focus her attention on one stimulus while ignoring another, her performance was in the low average range. *Id.* Dr. Ladle reported further that Plaintiff's verbal IQ was 108, her performance IQ was 84, and her full scale IQ was 96. *Id.* Dr. Ladle opined that Plaintiff had no mental health related diagnosis and he assigned her a GAF of 63. *Id.*

Plaintiff underwent a Comprehensive Driving Program following which it was recommended that Plaintiff drive only in familiar areas during low traffic times and that she limit distractions in the car. (Tr. 254-58).

Plaintiff underwent an evaluation at ProWork during the period August 11-18, 2005. (Tr. 259-74). At the completion of that program, the evaluators noted that they did not think that Plaintiff was aware of the extent of her learning difficulties, that her new learning skills were

significantly impaired and it did not seem feasible for her to regain her LSW, and that in order for Plaintiff to be successful in a new job, she would need extensive rehearsal and coaching. *Id.* The evaluators also noted that due to Plaintiff's low stamina, part time work was recommended as she initially made the transition back to work and that the evaluation results suggested that she would find greater success in a less-demanding, semi-skilled type of job. *Id.*

The record contains a copy Plaintiff's treatment notes from the Good Samaritan Hospital ambulatory care center where Dr. Brooks was her treating physician. (Tr. 276-95; 312-16). Those notes, dated May 31, 2005, through December 28, 2007, reveal that Dr. Brooks treated Plaintiff for various medical conditions including organic brain syndrome, cellulitis, sinusitis, allergic rhinitis, insomnia, knee pain, and headaches. *Id.* Over time, Dr. Brooks referred Plaintiff for a neuropsychological evaluation as well as for mental health treatment at Advanced Therapeutic Services. *Id.*

The record contains a copy of Plaintiff's treatment notes from Advanced Therapeutic Services dated October 1, 2007, through June 16, 2008. (Tr. 299-302; 325-42). Those records indicate that when Plaintiff was first evaluated, it was noted that she displayed no abnormal movements, had normal speech and thought processes, that her mood and affect were anxious and constricted, she was alert and oriented, and that her insight and judgment were fair and intact. *Id.* Plaintiff's diagnoses were identified as personality changes secondary to head injury, anxiety disorder NOS, and cognitive disorder secondary to head injury. *Id.* Plaintiff was treated with counseling and medications. *Id.* On April 28, 2008, Dr. Patel, Plaintiff's psychiatrist, and her therapist reported that Plaintiff had experienced a number of life events resulting from head injuries sustained in a fall which have resulted in physical and cognitive impairments as well as emotional

problems, that she was currently receiving medications/somatic and counseling services for treatment of personality altering brain trauma, post-traumatic stress disorder, and anxiety symptoms resulting from the life events, and that other areas of impairment included short-term memory problems and hypersensitivity to sound, and that she had an inability to maintain social interactions in public settings for an extended period of time. *Id.* Those mental health care providers noted that Plaintiff also reported impaired physical abilities in the areas of keeping her balance and negotiating stairs. *Id.*

Examining psychologist Dr. Allen reported in December, 2007, that Plaintiff was currently receiving mental health services through Advanced Therapeutics, she has used marijuana and crack cocaine in the past but indicated she last used crack about two to three months ago, she completed a bachelor's degree in psychology/social work, she displayed no psychomotor agitation or slowing, her speech was normal, and that she was alert and oriented. (Tr. 305-11). Dr. Allen also reported that Plaintiff's thought processes were normal, she had an euthymic affect, and that her motivation and effort were good. *Id.* Dr. Allen reported further that Plaintiff had a verbal IQ of 97, a performance IQ of 83, and a full scale IQ of 90 and her memory was in the borderline range. *Id.* Based on the results of the tests that Dr. Allen administered to Plaintiff, he noted that her cognitive functioning appeared to be in the average range relating to her verbal skills and abilities, that with her non-verbal skills and abilities, she demonstrated a much more variable level of ability ranging from average to moderate/severe levels of impairment suggesting there has been some degree of deterioration from premorbid levels of functioning. *Id.* Dr. Allen identified Plaintiff's diagnosis as rule out cognitive disorder NOS and he assigned her a GAF of 65-70. *Id.*

Plaintiff alleges in her Statement of Errors that the Commissioner erred in finding that

she did not have a severe physical impairment that would prevent her from performing work activity and by rejecting the opinion of her treating physician. (Doc. 7).

In support of her first Error, Plaintiff argues that the Commissioner erred by relying solely on Dr. Danopulos' and the state agency physicians' opinions, (Tr. 38, 39, 45-46), in determining that she does not have a severe physical impairment.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).

An ALJ does not commit reversible error in finding a non-severe impairment where the ALJ determines that a claimant has at least one other severe impairment and then goes on with the remaining steps in the disability evaluation, since the ALJ considers all impairments, including non-severe impairments, in determining residual functional capacity to perform work activities. *See, Maziarz v. Secretary of Health and Human Services,* 837 F.2d 240, 244 (6th Cir. 1987).

First, contrary to Plaintiff's argument, in determining that Plaintiff does not have a severe physical impairment, Judge Padilla considered Dr. Brook's treatment notes, Dr. Pedoto's report, the physical findings documented in Plaintiff's comprehensive driving program, and the objective test results. (Tr. 22-24). Specifically, Judge Padilla noted that there were few positive physical findings and that the objective tests reflected, at worst, some mild findings. *Id.*

Second, in determining that Plaintiff is not disabled, Judge Padilla did not stop at the second step of the sequential evaluation process. Rather, he found that Plaintiff had severe

impairments and continued through the evaluation process until he found that she is not disabled.

Accordingly, the Commissioner did not err by failing to find that Plaintiff has a severe physical

impairment. *Maziarz, supra.*

Plaintiff argues next that the Commissioner erred by failing to adopt Dr. Pedoto's

opinion as to her mental limitations.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ

must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406

(6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to

generally give greater deference to the opinions of treating physicians than to the opinions of non-

treating physicians because

> these sources are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [the claimant's] medical
> impairment(s) and may bring a unique perspective to the medical
> evidence that cannot be obtained from the objective medical findings
> alone of from reports of individual examinations, such as consultative
> examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,*

20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating

source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic

techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"

*Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544. "On the other hand, a Social Security

Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the

---

FN 1. Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are
binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders

opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07, *citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6ᵗʰ Cir. 2007)(emphasis in original).

In determining that Plaintiff is not disabled by her alleged mental impairment, Judge Padilla considered the mental health evidence of record as well as Dr. Pedoto's March, 2005, opinion that Plaintiff was moderately to markedly limited in her abilities to perform most work-related mental activities and is totally disabled. (Tr. 24-29). However, in rejecting Dr. Pedoto's opinion generally, Judge Padilla noted that Dr. Pedoto treated Plaintiff for only a short period of time, specifically, for the two week period she was in the rehabilitation unit of the hospital and for only a short time after her discharge. (Tr. 26). In addition, Judge Padilla noted that Dr. Pedoto is a physiatrist and not a mental health source or specialist with regard to cognitive disorders. *Id.*

The record supports Judge Padilla's observations about Dr. Pedoto. First, although he oversaw Plaintiff's care while she was on the rehabilitation unit of the hospital, that was for a limited period of two weeks. In addition, after Plaintiff's discharge from the rehabilitation unit on February 25, 2005, as noted above, she participated in CORP through April 29, 2005. However, the records from CORP indicate that her care was overseen by Dr. Gilliotte and not Dr. Pedoto. (Tr. 201). Further, the record reveals that Dr. Pedoto saw Plaintiff for the last time on May 9, 2005. (Tr. 189). Therefore, Dr. Pedoto's relationship with Plaintiff was, at best, short term. Finally, as Judge

Padilla noted, Dr. Pedoto is not a mental health expert. Therefore, his opinion as to Plaintiff's alleged mental limitations is outside his area of expertise.

Under these facts, the Commissioner had an adequate basis for rejecting Dr. Pedoto's opinion.

To the extent Plaintiff argues that the Commissioner erred by failing to find that she is disabled by her alleged mental impairment, the Court rejects that argument. As noted above, Dr. Bonds opined that Plaintiff's abilities to perform work-related mental activities are, at worst, mildly impaired. Similarly, Dr. Ladle opined that Plaintiff had no mental health related diagnosis and he assigned her a GAF of 63 indicating, at worst, "some" difficulty in functioning. Further, Dr. Allen opined that Plaintiff's cognitive functioning appeared to be in the average range and he assigned Plaintiff a GAF of 65-70, again indicating, at worst, "some" difficulty in functioning. Moreover, Plaintiff's treatment records from Advanced Therapeutic Services indicate that Plaintiff's mental status examinations were normal. Finally, the reviewing psychologists opined that Plaintiff does not have a severe mental impairment. (Tr. 225-38). Under these facts, the Commissioner did not err by failing to find that Plaintiff is disabled by her alleged mental impairment.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision

14

in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

April 2, 2010.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).